**MANHATTAN FRUIT EXPORT CORPORATION, Appellee,**

v.

**ROYAL NETHERLANDS STEAMSHIP COMPANY, Appellant.**

**No. 13, Docket 25503.**

United States Court of Appeals Second Circuit.

Argued Oct. 9, 1959.

Decided Nov. 9, 1959.

Herbert M. Lord, New York City, Burlingham, Hupper & Kennedy, New York City, Charles L. Trowbridge, New York City, of counsel, for appellant.

Edward R. Loomie, New York City, for appellee.

Before HAND, WATERMAN and FRIENDLY, Circuit Judges.

HAND, Circuit Judge.

The defendant appeals from a judgment for damages to 1000 cases of plums delivered to the defendant's motorship, "Helena," at Brooklyn on September 30,

1953, and discharged at La Guaira, Venezuela, on October 13th. The complaint alleged that while in the defendant's custody it failed "to exercise due diligence to make the holds, refrigerating and cooling chambers and all other parts of the ship * * * safe" for the carriage of the fruit, and the only issue litigated was the failure to perform this undertaking along with the related issue of the condition of the plums when delivered.

■ The plums were shipped under two bills of lading on which were stamped two clauses: (1) "refrigerated stowage 35/40," and (2) *"Refrigerated cargo:* to be carried in refrigerating compartment in which the air temperature is to be maintained between about 35° and 41° Fahrenheit." The plaintiff introduced testimony that the plums were in good condition when delivered, and that they had begun to decay upon their discharge at La Guaira; and Judge Leibell found that they were sound when shipped, had been spoiled en route and fixed the amount of the loss. We find it unnecessary to review these findings and we shall accept them for the purposes of this appeal because we think that the plaintiff did not prove that the defendant failed to perform its contract. Its obligation was limited by the clauses in the bills of lading; that is to say, it performed its obligation if the temperature in the compartment where the plums were stowed was kept "between about 35° and 41°." In view of the first quoted clause in the bills of lading we shall read the maximum as 40°, not 41°. The plums were stowed in what was known as the starboard 'tweendecks "reefer," a compartment so built as to exclude the entrance of air, and furnished with cooling coils which, when properly operated, would keep the temperature in the "reefer" at below 40° Fahrenheit. The defendant argues that it so conclusively proved that this was done that it was "clearly erroneous" for the judge to find that it was not. This it sought to establish by Exs. F–1 and F–2 which were charts, purporting to record the tempera-

ture in the "reefer" every two hours between September 30 and October 13. The practice was for someone of the ship's company (whether a sailor or an officer does not appear), to look at a thermometer placed in the ceiling of the "reefer," thirty feet above the 'tweendeck, and to record the readings upon pieces of paper which he then delivered either directly to the chief mate, Vermeulen, or to some other person who turned them over to that officer. Vermeulen then prepared the charts (Exs. F–1 and F–2), from these "rough notes," which he threw away. It may be assumed from a letter of the defendant that in making the charts the temperatures recorded were not exactly those taken down on the "rough notes" but "only the average temperature" if the difference between it and that observed was only half a degree, Centigrade. This we understand to mean that, as long as the actual temperature observed was not about five degrees Centigrade (41° Fahrenheit) the entries on the charts might vary half a degree, Centigrade. All entries from 6 a. m. on October 1 to 8 a. m. October 13, were 40.1° Fahrenheit or less and therefore complied with the bills of lading. We can see no reason for supposing that they were fabricated for the purpose of excusing the ship. Possibly we might have some doubt about reversing the trier's refusal to accept the charts, if the testimony had been taken in court; but so far as concerns this part of the record, it was all by deposition so that we are in as good a position as the judge to decide their dependability. Not only would their fraudulent concoction be an altogether gratuitous imputation; but similar charts for the neighboring "reefer," No. III, frankly disclosed a continuous failure to maintain the stipulated temperature, and the defendant admitted liability for the damage so caused. It is most improbable that, having thus conceded its fault throughout the same period as to one "reefer," it should have palmed off a fictitious record for the other. There can of course be no doubt as to the competency under § 1732, of Title

28 U.S.Code, of documents prepared as these were.

Judge Leibell thought the charts unreliable because there was "no proof as to when the temperature record (Ex. F–1) was made, whether the entries were all made at the same time or how soon they were made after the temperature record was put on the first or rough paper. But this much appears, that if the temperature record was made subject to the above instructions then it recorded something other than what the thermometer indicated, and further the temperature record itself (Ex. F–1) shows that those instructions were not followed on September 29th and 30th, or on October 1st and 2nd." We cannot understand why it throws any doubt upon the reliability of the charts that the entries were made at different times, or how soon that was after the "rough notes" were made. The charts would be equally truthful, whenever the figures were transcribed from the original slips; indeed the slips themselves would have been a nuisance, if they had been kept in their original form and their contents had not been put into a readily available form. Nor do we understand in what respect the "instructions" were not followed, or why the record was of "something other than the thermometer indicated," unless it be that fractions of less than one degree, Centigrade, were not recorded. None of the plaintiff's plums were stowed until September 30th, and, while it is true that on that day and October 1st, though not on October 2nd, the temperatures did rise above 41°, that does not show that the "instructions" were not "followed," because the periods when this was true were when the plums or other cargo in No. IV were being stowed and when the door of the "reefer" had to be kept open. That was inevitable, and shippers were certainly charged with notice that it would occur. Finally the plaintiff argues that Vermeulen's testimony supports its position, because although in his deposition he denied that he saw any damage to the plums in No. IV at the outturn in La Guaira, in correspondence between the defendant's New York and Amsterdam officers it was stated "that several packages were inspected by him at La Guaira and he had noted that in cases with rotten plums he had also found some which were hard and green." This statement does not show where the "packages" had been stowed that had contained the "rotten plums," and it is entirely consistent with their having been stowed in "reefer," No. III, where there was a complete breakdown in refrigeration. For the foregoing reasons we feel obliged to hold that it was "clearly erroneous" to conclude that the charts Exs. F–1 and F–2, were not reliable, and that they discharged the burden of proof that § 1304 (2) (q) of Title 46, imposed upon the defendant.

Judgment reversed; complaint dismissed.