**HELLENIC LINES LIMITED,**
**Plaintiff-Appellant,**

v.

**LIFE INSURANCE CORPORATION
OF INDIA, Defendant-Appellee.**

**HELLENIC LINES LIMITED,**
**Plaintiff-Appellant,**

v.

**AETNA CASUALTY & SURETY COM-
PANY et al., Defendants-Appellees.**

Nos. 84, 85, Dockets 74–1629, 74–1632.

United States Court of Appeals,
Second Circuit.

Argued Oct. 9, 1975.

Decided Nov. 26, 1975.

Alexander S. Kritzalis, New York City
(Burlingham, Underwood & Lord, Her-
vey C. Allen, and John S. Rogers, New
York City, of counsel), for plaintiff-ap-
pellant.

Donald M. Kennedy and Thomas D.
Toy, New York City (Donovan, Donovan,
Maloof & Walsh, Francis J. McCaffrey,
and Hill, Rivkins, Carey, Loesberg &
O'Brien, New York City, of counsel), for
defendants-appellees.

Before KAUFMAN, Chief Judge, and
FRIENDLY and SMITH, Circuit Judges.

PER CURIAM:

Hellenic Lines Limited (Hellenic), own-
er of the vessel Hellenic Sailor, appeals
from the dismissal by Judge Griesa, in
the District Court for the Southern Dis-
trict of New York, of two consolidated
complaints seeking general average con-
tributions of approximately $135,000
from marine insurers of cargo; the sum
represents a share of the extra expenses
incurred in preserving the ship and cargo
and completing the voyage after a frac-
ture of the vessel's crankshaft which oc-
curred in the Red Sea on December 24,
1967, some 36 days after she left New
York, her last loading port, and as she
was approaching Jeddah, her first port
of discharge.

There is no dispute over the governing
rule of law. The bills of lading con-
tained New Jason clauses, the effect of
which, in light of the Carriage of Goods
by Sea Act [COGSA], 46 U.S.C. § 1300 et
seq., is that "the ship is entitled to recov-
er general average expenses in just ex-
actly the same cases as those in which it
would have been immunized against car-
go claims, had cargo been damaged." Gil-
more & Black, The Law of Admiralty, at
267 (2d ed. 1975). COGSA requires that
"The carrier shall be bound, before and
at the beginning of the voyage, to exer-

cise due diligence to—(a) Make the ship seaworthy," 46 U.S.C. § 1303(1), and provides that "Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier . . . ," 46 U.S.C. § 1304(1). That the damage in this case resulted from unseaworthiness is not contested.[1]

Recognizing that decision turned on the resolution of extremely technical issues of fact, Judge Griesa, who obviously had paid exceedingly close attention as the evidence came in, dictated an admirable opinion from the bench, to which we can add little. He found that the fracture of the No. 2 after side rod crankshaft web, just in front of the No. 3 bearing, began as a fatigue crack followed by a sudden rupture of the rest of the web; that the crack and rupture were the result of a bending stress on the web; and that the probable cause of the bending stress was the flexing of the nearby large crankshaft web resulting from the crankshaft's being out of alignment. We do not understand the correctness of these findings to be seriously disputed; in any event they surely are not clearly erroneous. Hellenic's attack is directed rather at the judge's conclusion that it had failed to demonstrate the exercise of due diligence with respect to the non-alignment of the crankshaft.

The court placed primary, although by no means sole, reliance on two sets of circumstances. The first was this: On October 11, 1967, when the Hellenic Sailor was making an earlier stop in New York, a wire gauge reading of crankshaft alignment was taken by Golten Marine, Inc., a concededly competent marine repair firm. This showed sags of 32/1000ths of an inch at No. 4 main

bearing, 42/1000ths of an inch at No. 3, and 32/1000ths of an inch at No. 2. At the time, the vessel was lightly loaded, with a draft of 12′6″ forward and 22′10″ aft. When Charles Allan, Hellenic's marine superintendent, returned from a vacation on which he had gone shortly after October 11, he wrote a letter, dated November 6, to Marcos Evangelou, the Hellenic Sailor's chief engineer. This enclosed a copy of the readings, asked Evangelou to note the position of the crankshaft "with Nos. 2, 3 and 4 below the '0' line," and added that this had occurred while the ship was in a comparatively light condition.[2] Allan concluded: "We will take further readings at the next available opportunity with the ship in both loaded and light conditions." In a deposition Allan testified that his concern was that the readings showed a deflection somewhat greater than it should have been and that the difference between the draft fore and aft might have made the readings unreliable.

Evangelou testified that on November 13 he took shaft alignment readings at Philadelphia when the vessel was much more fully, and more evenly, loaded, with a draft of 24′6″ forward and 28′3″ aft. After Evangelou had unsuccessfully sought to identify a document as showing these readings, Hellenic advised the court that it did not contend that the document reflected readings taken at Philadelphia. The Philadelphia readings were not produced, and no explanation for their non-production was made.

The second set of circumstances was this: There was evidence that what is known as a web deflection test is also useful in detecting inordinate stress on the webs. Allan testified in his deposition that web deflection tests are "essential"; that the chief engineers on the

---

1. Plaintiff also relies on 46 U.S.C. § 1304(2): "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—(p) Latent defects not discoverable by due diligence." On the facts of this case we fail to see how this provision raises any additional issue.

2. The significance of this condition was that, as the judge said on the basis of uncontradicted evidence, "in a loaded condition one would expect the vessel to go from a sag to a hog."

Hellenic Line's vessels took· such tests almost every voyage; that the results would be recorded and kept on the vessels; and that he would not be informed unless there was something abnormal. Beyond that the manufacturer of the vessel had sent a letter to the American Bureau of Shipping on September 14, 1960, with a copy to Hellenic which was produced from its files, enclosing a copy of "recommended deflections of crank webs," and Doxford & Sons, Ltd., the original designer of the type of engine used on the vessel, had engaged in extensive research and published web deflection standards for their crankshafts. The record contained web deflection readings made on the Hellenic Sailor on October 31, 1960, November 23, 1960, and sometime during September, 1962, but none thereafter.

Hellenic does not argue that it had ordered web deflection tests to be taken during the voyage and the Chief Engineer failed to make them. Rather it contends, based on some of the evidence but contrary to the opinion of its marine superintendent, that the wire gauge test and the web deflection test are duplicative, and that therefore there was no need to take a series of web deflection tests. Judge Griesa found that "the plaintiff has failed to sustain its burden of proof in connection with its assertion that it did not need to take web deflection readings," and. that, accordingly, it had not "satisfactorily explained the absence of any specific information regarding such readings . . . following September 1962." We are not persuaded that we should disturb these determinations. However, even if we were to adopt the plaintiff's contention, and were to say that the absence of web deflection readings could be justified by the presence of wire gauge test results, this would not carry the day for the plaintiff in light of the conclusions with respect to the Philadelphia readings.

As to these the judge was justified in concluding that one of two things occurred—either they were never made or they were made and had become unavailable. If no tests were made, the Chief Engineer had failed to do what Hellenic's own marine superintendent had directed, and the vessel departed New York, her last loading port, without these having been made. If they were made, as Evangelou testified, the judge was justified in inferring from their unexplained non-production that they were unfavorable. As Mr. Justice Story elegantly observed, such non-production is "a very awakening circumstance, calculated to excite the vigilance, and justify the suspicions of the court," *The Pizarro,* 2 Wheat. (15 U.S.) 227, 241, 4 L.Ed. 226 (1817). We recently summarized the developed law on this subject in *Tupman Thurlow Co., Inc. v. S. S. Cap Castillo,* 490 F.2d 302, 308 (2 Cir. 1974), and need not repeat that analysis. See also 2 Wigmore, Evidence § 291(3) (3d ed. 1940). Although in the *Cap Castillo* case we "hesitate[d] to conclude that the non-production can stand alone as the determinative factor . . . ," *id.,* here we have, in addition to the failure to produce web deflection readings, Allan's own concern about the New York wire gauge measurements and other evidence relating to the ·unfavorable sag trend which was shown in successive wire gauge measurements of the crankshaft.

Hellenic seeks to answer all this on the basis of expert testimony that a wire gauge reading at Philadelphia, or a web deflection test during the voyage, would have disclosed nothing alarming since telescopic readings taken at Port Sudan in early February, 1968, after the crankshaft fracture and an effort at temporary repairs, showed sags considerably less than the New York October 11, 1967 readings. The judge rejected this on the basis of Allan's deposition testimony that the post-fracture readings would not be indicative of pre-fracture conditions. While Hellenic mounts a valiant effort on this point, we are unconvinced that the judge's conclusion was clearly erroneous or indeed was erroneous at all.

Affirmed.