785 F.2d 503
 5 Fed.R.Serv.3d 213
 Richard C. JOHNSON d/b/a Arnold Distributors, Appellee,
v.
OROWEAT FOODS CO. d/b/a Arnold Bakers, Appellant.
Richard C. JOHNSON d/b/a Arnold Distributors, Appellant,
v.
OROWEAT FOODS CO. d/b/a Arnold Bakers, Appellee.
 Nos. 83-1926(L), 83-1941.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 7, 1985.
Decided March 6, 1986.
 
 John E. Griffith, Jr. (Lewis A. Noonberg, Piper & Marbury, on brief) for appellant/cross-appellee.
 Dana A. Pescosolido (Joseph M. Fairbanks, Fairbanks and Gault, William K. Meyer, Darcy Rood Massof, Weinberg and Green, Harold L. Novick, Larson & Taylor, on brief) for appellee/cross-appellant.
 Before RUSSELL and MURNAGHAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 MURNAGHAN, Circuit Judge:
 
 
 1
 Oroweat Foods Co., the defendant, has appealed from a judgment for the plaintiff, Richard C. Johnson, in a breach of contract action initiated in the United States District Court for the District of Maryland. Oroweat does not contest the jury's finding of liability for breach of contract, but it does appeal the method and amount of the district judge's award of damages based on the jury's answers to special interrogatories. Johnson, by cross-appeal, complains of the court's denial of leave to amend his complaint to add a second count claiming violation of the Connecticut Franchise Act.
 
 I.
 
 2
 Oroweat is a food products company based in Greenwich, Connecticut, which sells baked goods under the trade name "Arnold Bakers." On January 9, 1973, Johnson and Oroweat entered into a contract whereby Johnson agreed to serve as a wholesaler for Arnold baked goods, with exclusive distribution rights, in most of Prince George's County, Maryland, and part of the District of Columbia. As a wholesaler, Johnson purchased Arnold baked products from Oroweat for resale to eleven independent distributors who physically distributed the products to the stores.
 
 
 3
 Johnson and his wife, Pamela Johnson, operated the wholesale business continuously from January 9, 1973, through December 28, 1982, when Oroweat terminated the wholesalership contract. During the entire period, Richard Johnson worked full time in the business. Pamela Johnson devoted between 20 and 40 hours per week to the business, and during the last few years she worked approximately 30 hours per week.
 
 
 4
 The gross income from the business consisted of the difference between the purchase price of baked goods bought from Oroweat and the price at which the goods were resold to the distributors. Johnson calculated the net income from the business by subtracting rent, utilities, motor vehicle costs, and other miscellaneous costs. Johnson did not, however, subtract any amounts as salaries or other compensation for either himself or his wife. Thus, the "net income" figures for the business as computed by Johnson would have to be adjusted downward to include two additional items: compensation for Richard Johnson's services and compensation for Pamela Johnson's services. During the last four years that the Johnsons operated the business, its annual net income, as calculated without allowance for compensation to the Johnsons, hovered around $30,000 per year. Net income was $27,391 in 1979, $29,552 in 1980, and $28,860 in 1981. Net income for 1982 was not available from tax returns at the time of trial, but Johnson's expert witness projected 1982 net income at approximately $34,732.
 
 
 5
 At the time of the termination, Richard Johnson was 43 years old and Pamela Johnson was 41 years old. Prior to Johnson's purchase of the wholesale business, he had been employed as a meat cutter for Safeway Stores, Inc., in the Washington, D.C. metropolitan area. Pamela Johnson had previously been employed as a legal secretary. Both Johnsons were in good health and could be expected to be able to work in the future.
 
 
 6
 On December 30, 1982, Johnson filed his action for breach of contract. Johnson subsequently moved on February 28, 1983 to amend his complaint to add a second count claiming violation of the Connecticut Franchise Act, Conn.Gen.Stat. Sec. 42-133l (a). The district court denied Johnson's motion on March 4, 1983, on the ground that, with the trial then scheduled for March 14, 1983, the amendment would be prejudicial to Oroweat. The court added that, in its judgment, the applicability of the Connecticut Act to the Oroweat-Johnson wholesale dealership agreement was "somewhat questionable," and suggested that Johnson's wholesaler status would not constitute a "franchise" within the meaning of the Connecticut Act.
 
 
 7
 On April 15, 1983, following trial, the jury rendered its verdict in special verdict form. The jury found Oroweat liable for breach of contract, and then answered special interrogatories related to damages:
 
 
 8
 1. What was the fair market value of Mr. Johnson's wholesalership in December of 1982?
 
 
 9
 $189,965
 
 
 10
 2. What is the fair market value of Mr. Johnson's wholesalership today?
 
 
 11
 $170,969
 
 
 12
 3. Has Mr. Johnson lost any earnings, beginning on January 8, 1983, which are not included in the fair market value of the business in December, 1982?
 
 Yes X
 No X
 
 13
 If you answer this question "yes," proceed to question 4. If you answer it "no," the forelady should sign and date these answers.
 
 
 14
 4. What is the present value of Mr. Johnson's lost future earnings not included in the value of the business in December, 1982?
 
 
 15
 $541,132
 
 
 16
 5. What is the present value of Mr. Johnson's alternative future earnings if he is not an Oroweat wholesaler?
 
 
 17
 $388,505
 
 
 18
 On August 29, 1983, the district court filed a memorandum opinion and entered judgment for Johnson in the amount of $323,596. The court apparently arrived at the figure by adding the jury's valuation of Johnson's business as of the time of trial, $170,969, to the jury's valuation of Johnson's lost future earnings, $541,132, and then subtracting the jury's figure for Johnson's alternative future earnings, $388,505, to get a final total of $323,596. No deduction was made for Pamela Johnson's alternative future earnings.
 
 II.
 A. The Measure of Johnson's Expectations
 
 19
 In Maryland,[1] a party suffering a breach of contract is entitled to recover as damages the amount that would place him in the position he would have been in had the contract not been broken. National Micrographics Systems, Inc. v. OCE-Industries, Inc., 55 Md.App. 526, 532, 465 A.2d 862, 867 (1983), cert. denied, 298 Md. 395, 470 A.2d 353 (1984). Thus, the injured party is able to realize his expectations from the contract had there been no breach. See E. Farnsworth, Contracts Sec. 12.8 at 839. However, the sum awarded as damages to Johnson by the district court puts him in a better position than he would have enjoyed in the absence of a breach. The formula employed by the district court has resulted in an award to Johnson in excess of his rightful expectations.
 
 
 20
 Johnson had two reasonable anticipations from the wholesale dealership contract with Oroweat. Because the contract could not be terminated without "just cause", Johnson expected to be able to realize income from operation of the business until his retirement at age 65, which would have occurred in 2004. Johnson also expected to be able to sell the business upon his retirement in 2004. Thus, but for the breach, Johnson would have received the net income for each of the years from 1983 through 2004, plus the proceeds from a 2004 sale of the business.
 
 
 21
 There are two ways to arrive at a dollar figure that correctly would represent the value of Johnson's expectations. The most obvious way is to attempt to measure his expected income from the business from 1983 through 2004, and then to estimate the market value of the business in 2004. The annual net income from the business was about $30,000 per year. However, Johnson would have received the aggregate of expected income only in installments over a 21-year period. A damage award, on the other hand, would give him everything immediately. Therefore, each year's annual net income must be discounted to its "present value" at the time the contract was terminated.[2]
 
 
 22
 The next step would be to estimate the market value of the wholesale business in 2004. Again we deal with a figure which must be discounted to its present value at the time of the termination of the contract. Under the first of the two acceptable alternatives, the sum of the present values, at the time of the termination, of Johnson's expected annual earnings up until 2004 and the reasonable 2004 market price for the business represents the recovery to which Johnson is entitled.
 
 
 23
 The acceptable alternative way to measure the value of Johnson's expectations is to look at the market price of his wholesale business as of the date of the termination of the contract. According to economic theory, that market price should be approximately equal to the present value of all the income that can be derived far into the future from the business. A purchaser contemplating buying Johnson's business as of December 28, 1982, would want to know how much income he could expect to make from the business over time. The purchaser could probably expect to do about as well as Johnson would have done. If the hypothetical purchaser also intended to operate the business until 2004, and then sell it, the purchaser could also expect to earn approximately $30,000 per year from 1983 through 2004, plus the proceeds of the sale of the business in 2004. The present value of anticipated earnings for each year subsequent to 2004 is but another expression for describing the market value of the wholesale business in 2004. Consequently, the price a purchaser would pay--the market value--would be equal to the present value of the expectations of all future earnings to be obtained from the business.
 
 
 24
 In actual practice, the two amounts--the present value of all future earnings and the market value of the business--will not be exactly the same. One reason is that prospective purchasers of the business would be working with inadequate information, and it would prove hard for them to estimate accurately just what the future earnings of the business would be. So the market price would be the average of the guesses of the various potential purchasers. Another reason is that the business might earn more or less, in the purchaser's hands than in the seller's. If the purchaser were a better business manager, he or she could expect to earn more than the seller could have earned. That purchaser would be willing to pay more for the business, and his or her offering price would be slightly higher than the present value of the seller's expected earnings. If the purchaser, however, were a less adept manager than the seller, he or she would expect to earn less than the seller could have earned; the price offered would then be slightly less than the present value of the seller's expected earnings.
 
 
 25
 Nevertheless, the two methods of calculation--present value of all future earnings or market value of the business--are simply alternative methods of measuring the extent of the same injury. That is why courts allow a plaintiff to recover either the present value of lost future earnings or the present market value of the lost business, but not both. See Arnott v. American Oil Co., 609 F.2d 873, 886 (8th Cir.1979); cert. denied 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 755 (10th Cir.1975). Here, the district court permitted an overlap, awarding Johnson a) his lost future earnings until retirement in 2004 and b) the market value of the lost business not simply from 2004 on, but from 1982, the year it was lost. Thus it granted Johnson a double recovery for the years 1982 to 2004.
 
 
 26
 In our view, the first method of calculation--the present value of lost future earnings--may well be the more appropriate method for use in the present case. Unlike the stock markets or commodities markets, the market for baked goods wholesale dealerships is much less active, one markedly influenced by performance of a very few individuals. Hence, the market may not readily be relied upon to reflect accurately the value of the exchanged item. The market price for Johnson's wholesale dealership will be influenced, and perhaps distorted, by incomplete information and the varying expectations of individual purchasers. It is to be expected that a better result will be developed by allowing Johnson to prove the amount of future income that the business would have earned had it remained in his hands.
 
 
 27
 However, as things now stand, we are in no position to determine the correct amount of damages, because it is impossible to calculate that amount from the figures provided by the jury. It was not asked the essential questions under one of the two alternative ways of proceeding of a) the market value as of the date of termination or b) the loss of earnings indefinitely into the future. Those details were essential to arrive at a correct computation under one or the other of the alternative methods we have discussed. It will therefore be necessary to remand for a new trial as to damages.
 
 
 28
 B. Mitigation of Damages Through Alternative Earnings
 
 
 29
 There is another computation which will, on remand, require attention. The measure of lost expectations must be reduced by the amount of income that the Johnsons can expect to earn from their alternative pursuits. It is a settled principle of contract damages law, in Maryland as elsewhere, that an injured party cannot recover damages for loss that he can avoid by taking appropriate steps. Sergeant Co. v. Pickett, 285 Md. 186, 194-95, 401 A.2d 651, 655 (1979); Volos, Ltd. v. Sotera, 264 Md. 155, 175, 286 A.2d 101, 111 (1972); M & R. Contractors & Builders, Inc. v. Michael, 215 Md. 340, 354-55, 138 A.2d 350, 358 (1958). Recognizing that such was the case, the district court instructed the jury to calculate mitigation with respect to Johnson. He formerly worked as a meat cutter, and there is the possibility that he can obtain another meat cutting position. The jury reached a dollar figure for his alternative earnings by discounting his expected annual income as a meat cutter from 1983 through 2004 to its present value at the time of the termination of the contract. The district court then correctly subtracted that figure from the damage award.
 
 
 30
 However, the district court erred in failing to require a determination of Pamela Johnson's alternative earnings, if any, discounted to present value. Yet they should be subtracted, for Johnson will avoid an additional part of his loss if his wife obtains another job. Pamela Johnson left her job as a legal secretary when her husband purchased the wholesale dealership business and thereafter worked approximately 30 hours per week in the business. The value of her work was evidently not negligible. If someone else had performed those services, the business would have had to pay that person compensation, and, to that extent, the net profit would have declined. The business's "net income" could not properly be calculated without factoring in the value of her services.
 
 
 31
 There are two ways to look at the economic relationship between Richard and Pamela Johnson. Under one view, they operated the business together. Although technically it was owned by Richard Johnson alone, in effect it was a partnership. Neither was paid a salary. Instead, they both jointly retained the net income of the business and used it jointly for the support of both of them. So viewing the situation, it is reasonable to require both members of the partnership to mitigate by seeking alternative sources of income. Because it is likely that the Johnsons will continue to share their earnings with each other, each of them will benefit from the other one's alternative earnings.
 
 
 32
 A second way to view their economic relationship is to treat the wholesale dealership business as owned and operated by Richard Johnson alone. Under that view, Pamela Johnson was in effect her husband's employee. Her services had a monetary value equal to the amount that her husband would have had to pay someone else to perform them. By rendering her services without charge, Pamela Johnson contributed to her husband's income. She was in exactly the same position as she would have been had she received a salary, then made a gift of that salary to her husband. Thus, again, part of Richard Johnson's annual income was attributable to his wife's work. The value thereof must be subtracted in computing the actual profit of the enterprise.
 
 
 33
 By terminating the wholesalership contract, Oroweat has not disabled Pamela Johnson or otherwise deprived Richard Johnson of her services. For the purpose of the computation here to be made, we may expect that, if Pamela Johnson were employed somewhere else, she would continue to make a gift of her earnings to her husband. Even if she would not, the association of the Johnsons throughout the period when the wholesale dealership was in existence makes it appropriate that an imputed salary to Pamela Johnson, or alternative earnings by her, be taken into account.
 
 
 34
 At the same time, it is likely that both Johnsons will incur some expense in terms of time and effort in trying to find other work. Oroweat should compensate Johnson for expense of that nature. A terminated employee is entitled to recover expenses reasonably incurred in seeking alternative employment. Volos, Ltd. v. Sotera, 264 Md. 155, 176, 286 A.2d 101, 112 (1972); 11 Williston on Contracts, Sec. 1359 at 311. Those two matters, consideration of an imputed salary or of alternative earnings by the wife, and the partially offsetting expenses of finding new employment, should be inquired into on remand.
 
 III.
 
 35
 There remains for consideration the district court's denial of Johnson's motion to amend his complaint to add a second count for violation of the Connecticut Franchise Act.
 
 
 36
 Under Fed.R.Civ.P. 15(a), leave to amend a pleading "shall be freely given when justice so requires." The Supreme Court has emphasized that "this mandate is to be heeded." Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). In Foman, the Court indicated that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile. Id. The Fourth Circuit has held, as have a number of other circuits, that delay alone is not sufficient reason to deny leave to amend. The delay must be accompanied by prejudice, bad faith,[3] or futility. Davis v. Piper Aircraft Co., 615 F.2d 606, 613 (4th Cir.1980),cert. dismissed, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980); accord, United States v. Webb, 655 F.2d 977, 980 (9th Cir.1981); Buder v. Merrill Lynch, Pierce, Fenner & Smith, 644 F.2d 690, 694-95 (8th Cir.1981); Cornell & Co. v. Occupational Safety & Health Comm'n, 573 F.2d 820, 823 (3d Cir.1978).
 
 
 37
 Since the case must be remanded for a new trial, we need not determine whether the district court erred in finding that a grant of leave to amend would have resulted in prejudice to Oroweat. Circumstances will be quite different, with a new trial not so imminent. A prompt request repeating the application for leave to amend could hardly merit the description as prejudicial. It is true that prejudice can result where a proposed amendment raises a new legal theory that would require the gathering and analysis of facts not already considered by the opposing party, but that basis for a finding of prejudice essentially applies where the amendment is offered shortly before or during trial. See Roberts v. Arizona Board of Regents, 661 F.2d 796, 798 (9th Cir.1981); Lyons v. Board of Ed. of Charleston, 523 F.2d 340, 348 (8th Cir.1975); Head v. Timken Roller Bearing Co., 486 F.2d 870, 873 (6th Cir.1973).
 
 
 38
 Johnson also contends that it was questionable but we have no occasion to decide whether there would have been sufficient prejudice in any event. Here, Johnson filed his motion to add a new cause of action on February 28, 1983, two weeks before the scheduled trial date of March 14, 1983. The merits of the proposed new cause of action, alleging a violation of the Connecticut Franchise Act, however, in Johnson's submission, would have been substantially similar to the merits of the breach of contract claim. The issue under both the contract and the Act was whether Oroweat had terminated the wholesale dealership agreement without just cause. See Conn.Gen.Stat. Sec. 42-133l (a). Most of the facts to be analyzed would have been the same for both claims.
 
 
 39
 In any event, the remand we order for reconsideration of aspects of the claim of breach of contract creates a situation where time before trial will not be so truncated as was the case shortly before the initial trial. That additional consideration militates strongly in favor of permitting, on remand, the amendment to add the claim under the Connecticut Franchise Act.
 
 
 40
 Oroweat further suggests that leave to amend was properly denied because the amendment would have been futile.[4] Oroweat argues that the Connecticut Act does not apply to franchises located outside the state of Connecticut, and that Johnson's wholesale dealership was not a "franchise" within the meaning of the Act.
 
 
 41
 Leave to amend, however, should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face. Davis v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir.1980), cert. dismissed, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980); Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 644 F.2d 690, 695 (8th Cir.1981). That is not the case here. It is not obvious on the face of the proposed amendment that the Connecticut Act does not apply. The applicability of the Connecticut statute must be determined according to Maryland conflict-of-laws principles.[5] 5] The Maryland rule for torts would seem to be applicable here, because what is alleged--a violation of a statute--is essentially a matter of tort and not of contract.[6] Under that rule, the law of the place of injury applies. Hauch v. Connor, 295 Md. 120, 453 A.2d 1207 (1983). The place of injury is the place where the injury was suffered, not where the wrongful act took place. Frericks v. General Motors Corp., 274 Md. 288, 296, 336 A.2d 118, 123 (1975); President and Directors of Georgetown College v. Madden, 505 F.Supp. 557, 569 (D.Md.1980), aff'd in pertinent part, 660 F.2d 91 (4th Cir.1981); Uppgren v. Executive Aviation Services, Inc., 326 F.Supp. 709, 711-12 (D.Md.1971). Because the injury here was suffered in Maryland, it appears possible but not inevitable that the Connecticut Act may not apply to Johnson's termination. On the other hand, Johnson urges that the statutory violation is ancillary to the contract claim, and that, because Connecticut law governs question of liability for breach of contract,[7] the termination of his wholesale dealership is also subject to the Connecticut statute. The complexity of the arguments advanced by counsel on both sides indicates that the issue of the applicability of the Connecticut Act is not obviously frivolous.
 
 
 42
 Nor is it obvious that Johnson's wholesale dealership does not constitute a "franchise" within the scope of the Act. The determination of the existence of a franchise relationship under the statute appears to require a complex factual inquiry. See Consumers Petroleum, Inc. v. Duhan, 38 Conn.Supp. 495, 498-99, 452 A.2d 123, 125 (1982); Hydro Air, Inc. v. Versa Technologies, Inc. 599 F.Supp. 1119, 1124-25 (D.Conn.1984); Carlos v. Philips Business Systems, Inc., 556 F.Supp. 769, 776-77 (E.D.N.Y.1983), aff'd without opinion, 742 F.2d 1432 (2d Cir.1983). Without detailed analysis, the proper conclusion is unclear.
 
 IV.
 
 43
 The damages owed by Oroweat to Johnson were incorrectly calculated, and Johnson's motion to amend his complaint was either improperly denied or, upon renewal following remand, would become so. The district court's judgment is reversed and remanded a) with instructions to allow Johnson leave to amend his complaint to add a cause of action based on the Connecticut Franchise Act, b) for a new trial on the question of damages for breach of contract, and c) if leave to amend is timely renewed, for consideration of the Connecticut Franchise Act claim.
 
 
 44
 REVERSED AND REMANDED.
 
 
 
 [1]
 Under Maryland conflict-of-laws principles, the law of the forum governs the remedy in an action for breach of contract. Traylor v. Grafton, 273 Md. 649, 332 A.2d 651 (1975); Mandru v. Ashby, 108 Md. 693, 71 A. 312 (1908)
 
 
 [2]
 Of course, conversely, the final damage award must be increased by the amount of interest accruing between the date of the termination of the contract and the date the recovery is obtained
 
 
 [3]
 No assertion of bad faith on Johnson's part has been advanced, and our review of the record discloses no basis for one
 
 
 [4]
 With liability finally determined in Johnson's favor on the breach of contract claim, allowing him to proceed on the Connecticut Franchise Act count might well be moot, and in that sense futile, except for one reason at least why the measure of damages would be different. Johnson should be permitted to pursue the Connecticut Franchise Act claim, since under it he would be entitled to attorney's fees, relief not available under the count charging breach of contract. Whether there is any other difference in the measure of damages between the two claims is obviously not something for us to consider at the present stage of the proceedings
 
 
 [5]
 Under Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), federal courts must apply the conflict-of-laws principles of the state in which they sit. In the present case then, Maryland conflicts principles determine whether the Connecticut Act applies
 
 
 [6]
 Conduct is tortious in nature when it violates a duty owed to another individual, where that duty is imposed by law and not by contract. Wilmington Trust Co. v. Clark, 289 Md. 313, 327, 424 A.2d 744, 753 (1981)
 
 
 [7]
 Johnson argues that under Maryland law, the law that governs a breach of contract is the law of the jurisdiction where the last act occurred to make the contract binding, and that in this case that act occurred in Connecticut because Johnson travelled there to sign the contract. We do not decide the question, but merely refer to it to emphasize that futility may not properly be assumed to have been established if the requested amendment is allowed