**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 11-1995**

───────────

ALLFIRST BANK,

                Plaintiff – Appellee,

     v.

PROGRESS RAIL SERVICES CORPORATION; RAILCAR, LTD.,

                Defendants – Appellants.

───────────

**No. 11-2018**

───────────

ALLFIRST BANK,

                Plaintiff – Appellant,

     v.

PROGRESS RAIL SERVICES CORPORATION; RAILCAR, LTD.,

                Defendants – Appellees.

───────────

Appeals from the United States District Court for the District
of Maryland, at Baltimore.  Marvin J. Garbis, Senior District
Judge. (1:01-cv-02527-MJG; 1:01-cv-02991-MJG)

───────────

Argued:  December 5, 2012        Decided:  April 10, 2013

───────────

Before MOTZ, KING, and DIAZ, Circuit Judges.

───────────

Affirmed in part, vacated in part, and remanded by unpublished opinion.  Judge Diaz wrote the opinion, in which Judge Motz and Judge King joined.

———————————

**ARGUED:** Paul Mark Sandler, SHAPIRO, SHER, GUINOT & SANDLER, Baltimore, Maryland, for Appellants/Cross-Appellees.  Lawrence J. Gebhardt, GEBHARDT & SMITH, LLP, Baltimore, Maryland, for Appellee/Cross-Appellant.  **ON BRIEF:** Robert B. Levin, John J. Lovejoy, SHAPIRO, SHER, GUINOT & SANDLER, Baltimore, Maryland; Kirk McAlpin, Jr., CUSHING, MORRIS, ARMBRUSTER & MONTGOMERY, LLP, Atlanta, Georgia, for Appellants/Cross-Appellees.  Ramsay M. Whitworth, GEBHARDT & SMITH, LLP, Baltimore, Maryland, for Appellee/Cross-Appellant.

———————————

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

This is an appeal and cross-appeal from the district court's judgment in favor of Allfirst Bank ("Allfirst") for breach of contract. Progress Rail Services Corporation ("Progress") and Railcar, Ltd. ("Railcar") contend that the district court erred in finding that an oral agreement modified a prior written agreement between the parties and erred further when it granted Allfirst damages for breach of the oral modification. On its cross-appeal, Allfirst contends that the district court erred in its calculation of damages due to the court's refusal to consider expert testimony. As we explain, we affirm in part, vacate in part, and remand.

I.

A.

Progress and its wholly owned subsidiary, Railcar, sold Allfirst 996 railcars for $13,220,351 on November 30, 1998.[1] To memorialize the sale, the parties executed three documents, which they refer to collectively as the Portfolio Transaction:

---

[1] Although the transaction was formally a sale of railcars, its substance reveals that Allfirst actually loaned Progress and Railcar $13 million. The loan was to be repaid with interest from the proceeds of rent paid by the lessees for the use of the railcars. Structuring the transaction as a sale allowed Progress and Railcar to book a gain of $6,000,000 and remove the depreciated railcars from their balance sheet inventory.

the Assignment Agreement (signed by all parties), the Service Agreement (signed by Allfirst and Progress), and the Guaranty (also signed by Allfirst and Progress). Because the railcars were leased to various railroads, the Assignment Agreement provided for Progress and Railcar (collectively, "Defendants") to assign their rights in the leases to Allfirst. Defendants became Allfirst's agents in administering the leases, negotiating renewal or replacement leases, and ultimately selling the railcars. If a lease terminated before the end of the Portfolio Transaction's five-year term, Allfirst could direct Defendants to sell the railcars in lieu of negotiating a new lease. Any railcars still on the books at the end of the five-year term would also be sold, with Allfirst having a right of first refusal to buy them at a fixed purchase price.

Among other things, the Service Agreement required Progress to maintain the railcars in a condition to allow them to be leased at the "Minimum Net Rent," an amount defined in the Assignment Agreement and due to Allfirst each month. J.A. 1013, 1102. Progress was required to make all repairs throughout the lease term unless the lessee assumed that obligation. Even so, it was Progress's responsibility to enforce the lessee's repair duty. After Allfirst was paid the Minimum Net Rent each month, any surplus would first go to Progress as reimbursement for

4

service fees, with any remainder to go to a joint account to be held for subsequent shortfalls in rental payments.

In the separate Guaranty, Progress made two commitments to Allfirst. First, Progress guaranteed that Allfirst would receive the Minimum Net Rent for each railcar for three years. If the actual rent Allfirst received for a railcar fell short of this amount, Progress agreed to pay the difference. Second, Progress guaranteed that when Allfirst sold or scrapped a railcar, Allfirst would receive that car's Stipulated Loss Value ("SLV"), listed in the Assignment Agreement. If the sale proceeds were less than the SLV, Progress agreed to pay the difference. The SLV of each car decreased over the five-year term of the deal.

Progress's two guaranties to Allfirst were subject to a total limit of 9.995% of the amount Allfirst paid for the railcars under the Assignment Agreement, plus interest. This limit was to be reduced by Progress's payments to Allfirst under the Guaranty, including payments for the difference between a railcar's SLV and sale price, and for the difference between the Minimum Net Rent and the actual rent received. As an example, the Guaranty limit as of November 1998 was approximately $1,265,903. If a railcar's actual earned rent fell short of its Minimum Net Rent by $1000, Progress would pay that difference to Allfirst and then deduct $1000 from the Guaranty limit, reducing

5

its total potential liability to Allfirst under the Guaranty to $1,264,903.

## B.

Of the 996 railcars sold to Allfirst, 400 were subject to leases that expired at various times in 1999. It became apparent to the parties that the railcars would require extensive repairs before they could again be leased. In some cases, the potential repair costs exceeded what the railcars could earn in rent. As a result, when the leases ended, Railcar elected to "park" most of the cars, while continuing to remit monthly rent payments to Allfirst.[2]

On February 10, 2000, Allfirst and Railcar met to discuss a number of financing transactions, including the Portfolio Transaction. At the meeting, Eugene Martini, who was then Railcar's CEO, described the condition of the 400 railcars with expired leases and offered to pay Allfirst the SLV for each car, scrap them all, and remove them from the Portfolio Transaction. Martini said that Railcar would absorb the resulting losses. Allfirst accepted the offer, but this agreement was never reduced to writing.

---

[2] We do not know why Railcar assumed Progress's responsibility under the Guaranty agreement to make the rent payments.

Following the meeting, Railcar began scrapping the railcars. Railcar at first absorbed the losses on its books, without attempting to reduce the Guaranty limit. In the spring of 2001, however, Railcar, now led by Jim Smallwood, took the position that the Portfolio Transaction documents were controlling and that any oral agreement made by Martini at the February 10 meeting was unenforceable. Railcar asserted instead that the Guaranty limit should be reduced by the difference between the SLV and the scrap value for each of the 400 scrapped cars. This meant, according to Railcar, that it had paid Allfirst in excess of the Guaranty limit and was entitled to a $1,350,000 refund. In addition, for the twelve remaining railcars subject to the February 10 agreement, Railcar paid Allfirst only the scrap price for eleven and paid nothing for the remaining one.

Beginning on August 1, 2001, Defendants stopped making regular monthly rent payments. In addition, many of the remaining railcars could no longer be leased due to maintenance issues or were not re-leased after their initial leases ended. When this litigation commenced, 483 railcars were still on the books. Allfirst sold these remaining railcars for scrap value after trial.

7

C.

Defendants sued Allfirst in the Superior Court of Fulton County, Georgia, alleging that Progress had overpaid Allfirst under the Guaranty and seeking a refund of $1,350,000. Allfirst removed the case to the United States District Court for the Northern District of Georgia and also filed a separate breach of contract action against Defendants in the United States District Court for the District of Maryland.[3] Allfirst claimed that it had received neither the Minimum Net Rent nor the actual rent collected since August 1, 2001, and therefore the Defendants were in default under the Portfolio Transaction. Allfirst sought damages for the default, including the past due Minimum Net Rent for each railcar, the cost of unperformed repairs, lost rents for off-lease cars that sat idle until they were scrapped, and the difference between the scrap price received for each railcar and the amount the car could have been sold for had it been properly maintained. Defendants counter-claimed in the Maryland suit, seeking the alleged overpayment under the Guaranty, as well as other damages. After the initial suit was transferred to the District of Maryland, the cases were consolidated.

---

[3] The Portfolio Transactions documents provided that they were to be interpreted according to, and governed by, Maryland law. J.A. 1026, 1098, 1105.

During a seventeen-day bench trial, Allfirst presented the testimony of two experts regarding the market for railcar leases and sales. Allfirst's experts testified that the railcars still subject to the Portfolio Transaction after August 1, 2001, could have been leased had they been properly maintained. Each expert offered a range of rent prices they believed the cars could have fetched on the open market. Depending on the type of car, the length of the lease, and the type of the lease, their estimates ranged from $50 to $375 per month. The experts also testified as to the estimated value of the railcars had they been in serviceable condition at the end of the Portfolio Transaction's term. These estimates ranged from $1500 to $11,000 per railcar, depending on the car type and its condition at sale.[4] Defendants countered with expert testimony asserting that there was "virtually no demand" to lease one type of railcar. J.A. 545.

In its memorandum of decision, the district court held that Railcar and Allfirst created a valid, enforceable contract at the February 10 meeting, in which they agreed that Railcar's SLV payments to Allfirst would not reduce the Guaranty limit. As a

---

[4] Although the Service Agreement required that Progress maintain the railcars in a condition to allow the cars to be leased at the Minimum Net Rent, J.A. 1102, fluctuations in the market could change the condition a car would need to be in to earn that amount of rent. Therefore, the condition of the cars at sale could vary, depending on the market.

result, the court denied Progress's claim for $1,350,000 and awarded Allfirst damages for the difference between the scrap price and the SLV of the twelve scrapped railcars for which Allfirst had not yet received full payment.

Turning its attention to Allfirst's affirmative claims for damages, the court held that Defendants were liable to Allfirst for various unperformed repair obligations and missed rent opportunities related to specific leases. The district court, however, rejected Allfirst's assertion that it was due additional compensation for general missed rent opportunities for all remaining railcars not subject to the February 10 agreement. The court reasoned that Allfirst had not presented sufficient evidence to support this component of its damages claim. Similarly, the court rejected Allfirst's claim for additional damages for the difference between the sale price of the remaining railcars had they been properly maintained and the actual sale price, finding that estimates of the cars' potential fair market values were not sufficiently reliable because they were made more than a year prior to the date the cars were to be sold under the Assignment Agreement.

After resolving other issues, the court entered final judgment in favor of Allfirst for $3,379,061.00.[5] Both parties appealed.

## II.

The issues before us are whether Railcar and Allfirst created a valid, enforceable oral agreement at the February 10 meeting, and whether the district court erred in denying Allfirst's additional claim for damages for lost rents and sales. We consider each contention in turn.

## A.

We first consider Defendants' assertion that the district court erred in enforcing the oral agreement reached between Allfirst and Railcar at the February 10 meeting.

In general, we review the district court's rulings on legal issues de novo. We affirm factual findings unless they are clearly erroneous. Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 512 (4th Cir. 2002).

Defendants urge that although the issue of contract formation is typically a question of fact, Maryland law dictates

---

[5] This sum reflects the amount awarded for the SLV of the twelve scrapped cars for which Allfirst had not been paid, plus additional sums not contested on appeal.

11

that when material facts are not in dispute, the issue of whether a contract exists is a question of law subject to de novo review. Allfirst, on the other hand, asserts that the contract issue here is a question of fact, and that therefore the "clearly erroneous" standard should apply.

It is settled Maryland law that the existence and terms of an oral contract, when disputed, are for the trier of fact to determine. Weil v. Free State Oil Co. of Md., 87 A.2d 826, 829 (Md. 1952). When the parties present no dispute of material fact, however, the issue of contract creation is a question of law. See Weaver v. ZeniMax Media, Inc., 923 A.2d 1032, 1051 (Md. Ct. Spec. App. 2007); Mitchell v. AARP Life. Ins. Program, N.Y. Life Ins. Co., 779 A.2d 1061, 1068 (Md. Ct. Spec. App. 2001) ("[I]f there are no genuine disputes of material fact, then the reviewing court must determine if the trial court reached the correct legal result." (internal quotations omitted)).

In this case, the parties disagree as to the terms of the oral agreement, the basis for the agreement, and the capacity in which Railcar acted in carrying out the agreement. Because the parties dispute the material facts of the alleged agreement, we find that the questions regarding the existence and the terms of the contract are questions of fact. We therefore will not

12

reverse the district court's determination unless we find it clearly erroneous.

With that standard of review firmly in mind, we turn to Defendants' argument that the district court erred in finding that Allfirst and Railcar created an enforceable oral contract, including an agreement not to deduct Railcar's SLV payments from the Guaranty limit.

According to Defendants, the two parties could not have created a valid contract because the Guaranty was not discussed at the February 10 meeting and because the parties disagreed afterward, both internally and with one another, about the effect of the oral agreement on the Guaranty. Defendants also note that although Progress's rights and obligations were affected by the contract, it was not a party to the agreement, did not offer to take the loss on the scrapped railcars, and did not consent to assuming an increased obligation under the Guaranty. Relatedly, Defendants argue that enforcing the oral agreement in these circumstances allows Allfirst to reap a windfall.

Allfirst responds that the February 10 arrangement was a side agreement between Allfirst and Railcar that did not affect Progress's rights or obligations under the Guaranty. As a result, Allfirst argues, Defendants' complaint that Progress was

13

not party to the oral agreement is irrelevant. We agree with Allfirst.

The "[c]reation of a contract requires an offer by one party and acceptance by the other party." Cochran v. Norkunas, 919 A.2d 700, 713 (Md. 2007). "Acceptance of an offer is requisite to contract formation, and common to all manifestations of acceptance is a demonstration that the parties had an actual meeting of the minds regarding contract formation." Id. "[I]n other words, to establish a contract the minds of the parties must be in agreement as to its terms." Mitchell, 779 A.2d at 1069 (citation omitted).

We conclude that the district court did not clearly err in finding that Allfirst and Railcar created a valid, enforceable oral contract regarding the disposition of the 400 railcars. Martini testified that in proposing to scrap the railcars and pay the SLV, Railcar was offering to absorb the loss. Martini echoed this statement in his subsequent memo to Smallwood, which also supports the district court's finding that Railcar offered to make payments to Allfirst that would not reduce the Guaranty limit. John Cook, an Allfirst executive present at the February 10 meeting, also stated that Railcar offered to take the loss in removing the railcars from the transaction, and Cook thanked Railcar representatives for "not making [their] loss [his]

14

loss." J.A. 256-57. Finally, the parties acted in accordance with the agreement for nearly a year.

It is true that certain evidence--including other statements made by Martini at trial and an internal memo suggesting Allfirst's uncertainty about the effect of Railcar's payments on the Guaranty limit--weighed against finding a valid contract. We are mindful, however, of the deference accorded to the district court as the finder of fact at a bench trial. Because sufficient evidence was presented to support the court's view of the facts finding the existence of a contract, we decline to disturb that ruling.

Nor are we persuaded by Defendants' argument that the February 10 agreement was not valid because Progress was not party to it. The oral agreement between Allfirst and Railcar did not alter Progress's obligations to Allfirst under the Guaranty, and so Progress was not a necessary party.[6] Prior to the February 10 agreement, if a railcar was scrapped for less than its listed SLV, Progress was required to pay Allfirst the difference between the SLV and the scrap price. This amount was deducted from the Guaranty limit, reducing Progress's potential

---

[6] For this reason, the agreement did not violate Maryland's Statute of Frauds provision requiring that modification of guaranties be in writing. See Md. Code Ann., Cts. & Jud. Proc. § 5-901(1).

15

obligation to Allfirst. After the February 10 agreement, if one of the 400 railcars was scrapped, Railcar would send the SLV to Allfirst, and then Railcar would collect only the scrap price from Progress after Progress scrapped the car. The February 10 agreement did not require Progress to pay Allfirst the SLV, nor did Progress do so. J.A. 316-17. Because Progress did not pay Allfirst the SLV, Progress had no right to deduct the SLV amount from the Guaranty limit. Accordingly, the February 10 agreement did not alter Progress's obligations to Allfirst, and thus it does not matter that Progress had no say in it.[7]

Finally, we reject Defendants' contention that affirming the district court's ruling allows Allfirst to reap a windfall, in that it received the SLV from Railcar without deducting it from the Guaranty limit. To begin with, any benefit received by Allfirst is not a "windfall," but is instead the result of a mutually beneficial agreement between it and Railcar. The evidence at trial showed that Railcar believed that paying the SLV would maintain both its standing in the relatively small railcar industry and the goodwill of its longtime customer,

---

[7] Defendants attempt to avoid this conclusion by asserting that Railcar was acting as Progress's agent in remitting the SLV payments to Allfirst. Defendants, however, did not raise this agency argument until their reply brief, which means they waived it. See, e.g., Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995).

16

Allfirst.  As a result, both Allfirst and Railcar benefited from the February 10 agreement.

Second, Progress too enjoyed a tangible benefit from the oral agreement.  Without it, Progress would have been on the hook to Allfirst for the Minimum Net Rent for each railcar through the end of the Minimum Lease Term.  The February 10 agreement, however, allowed Progress to avoid this cost.

We therefore reject Defendants' claim of error on appeal.

III.

We next consider the cross-appeal wherein Allfirst contends that the district court erred in failing to award it additional damages for rental payment and sale price shortfalls, pursuant to the Guaranty.

"The calculation of damages is a finding of fact and therefore is reviewable only for clear error, but to the extent those calculations were influenced by legal error, review is de novo."  United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co., 86 F.3d 332, 334 (4th Cir. 1996).  In addition, the weight accorded to an expert's testimony is a matter for the trial court's discretion.  Am. Milling Co. v. Tr. of Distribution Trust, 623 F.3d 570, 573-74 (8th Cir. 2010).

17

## A.

The district court rejected Allfirst's request for additional rent damages because it found "the testimony inadequate to establish any reliable estimate of rental that could have been earned from hypothetical leases." J.A. 953. Specifically, the court determined that "[t]he evidence did not establish industry utilization rates, average fleet operability, bad faith on the part of Defendants, or any other basis for awarding Allfirst damages based upon theoretically available rental opportunities." J.A. 953.

We consider Allfirst's claim for additional rents to be akin to one seeking lost profits, and so we look to relevant Maryland law on that subject. To recover lost profits under Maryland law for breach of contract, a plaintiff must show that (1) the breach by the defendant was the proximate cause of the plaintiff's loss, (2) the defendant could reasonably foresee, when it executed the contract, that a loss of profits would be a probable result of a breach, and (3) the amount of lost profits can be proved with reasonable certainty. M & R Contractors & Builders v. Michael, 138 A.2d 350, 353, 355 (Md. 1958). "Losses that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as 'reasonably certain' and therefore recoverable as contract damages." Hoang

18

v. Hewitt Ave. Assocs., 936 A.2d 915, 935 (Md. Ct. Spec. App. 2007).

We conclude that the district court abused its discretion by summarily rejecting Allfirst's expert testimony regarding rent damages. The testimony of Allfirst's experts showed that the railcars could have been leased had they been kept in serviceable condition. Both experts also provided a range of rents that each car could have earned through November 30, 2003, depending on several factors. Other than contending that there was a weak market for one type of car (which an Allfirst expert accounted for in his report), Defendants' experts provided no substantive rebuttal to Allfirst's evidence on rent damages.

A district court certainly has discretion to reject expert testimony, see Pittman v. Gilmore, 556 F.2d 1259, 1261 (5th Cir. 1997), but it may not arbitrarily fail to consider it. Am. Milling, 623 F.3d at 573-74. In this case, the district court failed to explain why it chose not to credit Allfirst's evidence. Although the court stated that the potential lease opportunities described by the experts were "hypothetical"--one of the permissible bases for finding that lost profits are not "reasonably certain"--it did not explain why this was so. Furthermore, the court provided no explanation or authority for why an award of additional rent damages needed to be supported by "industry utilization rates" or "average fleet operability,"

19

J.A. 953, terms that no party introduced, explained, or otherwise relied on at trial.[8] We therefore vacate the judgment of the district court as to this component of Allfirst's damage claim and remand for further consideration of the issue.[9]

B.

Allfirst also asserts that Progress did not properly maintain the railcars through the end of the Portfolio Transaction term (November 30, 2003), and that as a result the cars could only be sold for scrap value. According to Allfirst, the district court should have awarded it damages for the difference between the value of the railcars had they been maintained and their actual sale price.

The district court agreed that Progress breached its obligation to maintain the railcars, but nevertheless held that

---

[8] The district court also noted that rent damages were not appropriate because the evidence did not show bad faith on the part of the Defendants. Such a showing, however, is not necessary in a typical breach of contract action. See Rumsey Elec. Mfrs. v. Livers, 77 A. 295, 301 (Md. 1910).

[9] There may well be a reasoned basis for the district court to reject Allfirst's claim for additional rent damages; we hold only that we can discern no such basis on this record. In that regard, we also note that the district court's brief discussion of the issue did not address all of the M & R Contractors factors necessary to award damages for lost profits, nor did it consider whether Progress's breach of the Guaranty was the proximate cause of Allfirst's damages. We think it appropriate for the district court to consider these issues--and any others relevant to the question of lost profits damages--in the first instance.

20

Allfirst could not collect sale price shortfall damages. The sole reason provided by the court was that the future estimates of the railcars' fair market values provided by Allfirst's experts were made more than a year prior to the operative date and were not "sufficiently reliable." J.A. 959.

We are constrained to find that the district court also abused its discretion as to this issue. To begin with, evidence of lost future expectations may properly be part of the damages that a party can recover for breach of contract. See Johnson v. Oroweat Foods Co., 785 F.2d 503, 507 (4th Cir. 1986). In Johnson, we considered the measure of damages for a breach in which the contract's termination date was twenty-one years after trial. Id. at 505-06. Applying Maryland law, we stated that such damages could be calculated either (1) by estimating the future earnings of the business over twenty-one years and discounting such earnings to calculate their present value, or (2) by estimating the market value of the business at the termination date, which in theory should have equaled the present value of all future earnings. Id. at 507-08.

Here, Allfirst's experts provided three separate reports regarding the estimated values of the railcars, dated November 20, 1998, February 28, 2002, and March 1, 2002. Each report estimated the future value of each railcar as of November 30, 2003. Depending on car type and potential condition at sale,

21

Allfirst's experts estimated that Allfirst could have received from $1500 to $11,000 per railcar.  As with the claim for additional rent damages, Defendants presented no testimony to contradict this evidence.

We readily acknowledge the broad discretion afforded to district courts in evaluating expert testimony as to future value, but a district court cannot summarily reject such evidence simply because the timing of the trial and its scheduling deadlines prevent a party from providing the court with estimates made closer to the operative date of the contract.[10]  While the district court did say that the evidence was not sufficiently reliable, it gave no explanation for this conclusion, save for the timing of the reports.[11]  We therefore

---

[10] The bench trial in this case commenced on May 20, 2003, and ended with closing arguments on July 11, 2003.  The district court entered its order addressing the damages issue on May 28, 2010.

[11] Although Allfirst's experts did not discount their estimates to their present value, Defendants did not challenge the claim on this ground, nor does it appear that the district court denied it on this basis.  Moreover, unlike in Johnson where the twenty-one-year span of future earnings was substantial, we are dealing here with a mere twenty-month span between the date of the last expert report as to value and the date when the railcars would have been sold.  In any event, the district court may, to the extent necessary, properly account for this issue on remand when considering the amount of damages (if any) that Allfirst should be awarded.

vacate the judgment of the district court as to this damage issue and remand for further consideration.

## IV.

We hold that the district court did not clearly err in finding that Railcar and Allfirst created a valid oral contract at the February 10 meeting. We hold further that the district court abused its discretion in assessing the merits of Allfirst's claims for additional damages. We therefore affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED